# CIRCUIT COURT OF THE CITY OF ROANOKE

Checker Leasing, Inc.

v.

Midpoint Pontiac-
Oldsmobile-Buick-
GMC Truck, Inc.

October 30, 1998

Case No. CL96-629

BY JUDGE ROBERT P. DOHERTY, JR.

The Plaintiff, Checker Leasing, Inc., a business operating numerous Avis car rental agencies throughout the country, orally agreed to buy, and the Defendant Midpoint Pontiac-Oldsmobile-Buick-GMC Truck, Inc., orally agreed to sell, automobiles at a fleet discount. The terms of the agreement were that Midpoint would order the vehicles from General Motors Corporation in such a way that the factory invoice would not include three specific factory charges, they being hold back, floor plan, and incentives. To accomplish this type of sales, Midpoint was required to place its order with General Motors under their fleet guarantee 100% repurchase program. A specific ordering code, VN9, was used to insure this type of sale from the factory and to get a factory invoice that did not include charges for hold back, floor plan, and incentives. The factory would deliver the new cars to various locations throughout the United States, and upon notification of the delivery, Checker would pay Midpoint the factory invoice charge plus thirty dollars. A large number of vehicles were purchased by Checker under this agreement. Thereafter, the Avis Licensee Association notified all of its franchisees that General Motors was offering a special sale on certain of its new vehicles at a $3,500.00 per vehicle discount. In order to take advantage of this offer, the purchaser had to order the vehicles under a special ordering code number,

VX5, which reflected a national fleet program discount. The orders had to be made within a specified time limit. The reduced price per vehicle under this offer was a better deal than the dealer could offer. Checker took advantage of the offer and ordered approximately 200 more new vehicles through Midpoint. Checker instructed Midpoint to use the new ordering code when placing their new orders. Midpoint was not aware of the terms of the special ordering code which was used but complied with Checker's request. This new ordering code, which was necessary to be used for Checker to take advantage of the $3,500.00 per vehicle discount offered by GMC, included the cost of hold back and floor plan on the invoices. As the vehicles were delivered, Midpoint presented the factory invoice to Checker along with their own invoice which added their thirty dollar charge to the factory invoice price. Each of these invoices from the factory listed a hold back charge, and some had a floor plan charge. As these invoices were presented to Checker over the ensuing months, Checker paid the charges in full. General Motors refunded the hold back and floor plan fees to Midpoint. Upon discovery that these funds were being paid to Midpoint, some of which were paid before the final Checker orders were placed, Checker demanded that this money be reimbursed to them under their original agreement. Midpoint refused claiming that, by insisting that the special order code be used, Checker had changed the contract. Checker denied that the contract had been changed. They subsequently filed suit to obtain the funds which had been paid to Midpoint. The Court finds in favor of Midpoint.

### The Contract

The oral agreement between the parties is as binding on them as a written contract. The problem with an oral contract is that it is frequently difficult to determine what was agreed. In this case, instead of an easily construed writing, it is necessary to rely on the recollections and memories of witnesses who made this agreement over a drink. The remembrances of these witnesses differ concerning what was said. The words used meant something different to each party, as evidenced by the testimony of what they each thought was their agreement.

The Court finds that the parties agreed that Midpoint would order vehicles from GMC for Checker using a VN9 code designation. This designation caused the factory invoice to be printed without the addition of charges for hold back, floor plan, and incentives. This is what Checker and Midpoint meant when they referred to a "clean" invoice during their initial negotiations. It was agreed that when cars were delivered to various locations throughout the country, Checker would pay the invoice price plus thirty dollars. Later Checker

changed the agreement by taking advantage of a $3,500.00 discount offered by GMC to Avis franchisees who ordered vehicles using a VX5 code designation. The VX5 code designation told the factory to include charges for hold back and, in some instances, charges for floor plan in their invoices. It also told the factory to deduct $3,500.00 from the overall invoice price of the vehicle. Under this agreement, Midpoint ordered vehicles for Checker with the VX5 code designation. When the invoices arrived, they were delivered to Checker with Midpoint's thirty dollar additional fee. Much of this was set forth on the face of the VX5 code invoices. They clearly indicated the charges for hold back and, in some cases, for floor plan. These invoices and charges are what Checker contracted for in order to get the $3,500.00 per vehicle discount when they changed their deal with Midpoint and required their orders to be sent to GMC using the VX5 code. Having gotten the benefit of their new bargain, Checker may not now resurrect the old agreement and claim the benefits of it also.

## Uniform Commercial Code

Notwithstanding the above, it might be helpful to address some of the specific arguments made by the parties concerning these transactions.

1. The purchase orders sent by Checker to Midpoint did not affect the underlying contract. They were not written expressions of the contract but were merely documents that acknowledged the existence of an agreement and that notified Midpoint of the number and type of vehicles Checker wished to purchase.

2. The parties were not operating under a mistake of fact. Rather, each was operating under a misunderstanding of how the other party viewed the terms of their agreement. Lack of understanding of contract provisions will not vitiate a contract or alter its terms.

3. The invoices did not constitute the contract, nor did they change the contract. They were nothing more than lists of goods furnished, together with their charges. They can, however, be viewed as proof of many terms of the contract and, when coupled with the payment, amount to persuasive evidence of those terms.

4. The argument of whether the ten-day time limitation for objections contained in Va. Code § 8.2-201(2) should be used, or whether the reasonable time limitation set forth in § 8.2-207(2)(c) should be used, makes no difference. Neither applies in this case as approximately six months lapsed after consummation of the contract and before Checker raised its objections. This time delay is not a reasonable one and is more than ten days.

5. If, as argued, it is possible to view the invoices containing the VX5 code designations and their additional fees for hold back, etc., as alterations to an existing contract, then certainly the payment of those invoices in full constitutes a definite and seasonable expression of acceptance of those changes as contemplated by § 8.2-207(1).

6. The Court rejects the argument that the payment of the invoice price by Checker was a mistake. The invoices contained a detailed listing of all the charges for the vehicles delivered. Those charges were consistent with the agreement of the parties and conformed with the specific ordering code supplied by Checker. The payment of those charges by Checker, in a timely manner and without objection, was a purposeful and considered act. It is unreasonable to accept that a prudent businessman would fail to read the invoices for approximately 200 separate vehicles they were purchasing, especially when millions of dollars were trading hands.

7. The conduct of both parties in complying with all of the terms of the contract as interpreted by Midpoint is consistent with the Court's findings as to the terms of the agreements.

The Court finds for the Defendant, Midpoint Pontiac-Oldsmobile-Buick-GMC Trucks, Inc. There was no breach of contract.